IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

**CARL LEE JOHNSON, JR.**   **PLAINTIFF**

V.   **CASE NO. 2:23-CV-2059**

**WALMART, INC.**   **DEFENDANT**

OPINION AND ORDER

Plaintiff Carl Lee Johnson, Jr. brought this action alleging various Title VII violations. In a prior Memorandum Opinion and Order (Doc. 46), the Court dismissed several of his claim but allowed his claims for a racially hostile work environment and retaliation to survive. The Court now takes up Defendant Walmart, Inc.'s Motion for Summary Judgment (Doc. 48), Brief in Support (Doc. 49), and Statement of Facts (Doc. 50). In lieu of filing a formal response, Mr. Johnson, proceeding *pro se*, sent an email to the Court, and the Clerk of Court filed the same at Doc. 52. For the reasons stated herein, the Motion for Summary Judgment is **GRANTED**, and the case is **DISMISSED WITH PREJUDICE**.

The following facts are supported by Walmart's summary judgment record. Because Plaintiff did not respond to Walmart's Statement of Facts or submit any evidence, and because Walmart's Statement of Facts is supported by the record, the following facts are considered undisputed.

At all relevant times, Walmart had a written policy against racial discrimination and harassment. (Doc. 48-1, p. 1). The policy explicitly prohibited certain actions, including, among other things, termination, denying training, failing to promote, using slurs, and offensive comments. *Id.* at p. 2. Additionally, it laid out reporting procedures for such

1

conduct, which advised a person to "immediately report the violation to any salaried member of management, to a People Partner representative, to your local Ethics & Compliance Office, or to the Global Ethics Office." *Id.*

Johnson began working as a Grocery Orderfiller at a Walmart in Clarksville, Arkansas on December 27, 2021. (Doc. 48-2, p. 2). Starting January 6, 2022—and throughout the course of his employment—Johnson regularly Facebook messaged Travis Schanink, an hourly employee who assists with training new employees, to make complaints about inadequate training and harassment. *See* Doc. 48-3, pp. 1–3. Schanink frequently elevated Johnson's concerns to a supervisor or to HR, and he also reminded Johnson to bring his concerns to the training manager, Guillermo Nava. *Id.* at pp. 3–4. For purposes of this Order, the Court will detail only those messages that could be construed as racially motivated or complaining of potentially retaliatory actions.

On March 9, 2022, Johnson messaged Schanink asking whether the managers have control over his work assignments because he kept receiving difficult assignments that made it hard for him to bring his productivity numbers up. *Id.* at p. 20. Schanink explained that the managers do not manually assign these trips. *Id.* at p. 21.

The first evidence of any mention of race is March 17, 2022, when Johnson sent Schanink a lengthy message that included a complaint that his coworkers have been making jokes, innuendos, and "'boy' calling." *Id.* at p. 22. In his deposition, Johnson clarified that he was referring to when another employee said, "Hey, boy . . . [W]hat are you doing. Haven't you worked here long enough? Don't you know how to do this yet?" (Doc. 48-4, pp. 5–6). Johnson also explained in his deposition that he believed his managers had overheard the comment and that Johnson had told them that the comment

2

was racially motivated, but they did not intervene until he confronted the coworker. *Id.* at pp. 6–7. According to Johnson's testimony, this was the only interaction he had with that coworker. *Id.* at p. 7. Additionally, at some point in these first few months of his employment, a coworker whose name Johnson does not know called him a "jive turkey who sucks c*ck," but Johnson concedes that he did not tell Schanink about this specific statement—he only mentioned "innuendos" and "comments." *Id.* at p. 4.

On April 23, Johnson messaged Schanink again that he appreciated Schanink's help, but that managers in his department had "pretty much told [him] to stop talking to [Schanink] and come to [them]." (Doc. 48-3, p. 29). Johnson explained that he did not intend to speak with the managers in his department because his "best interests don't reside with" them. *Id.* Johnson then stated that his "numbers would look great too if [he] was of fair color." *Id.* at p. 30. He concluded by telling Schanink that he would find someone else to "represent [him]" because he did not want to cause Schanink any problems. *Id.* at p. 31.

On May 7, Johnson messaged Schanink again and asked "who next" he should "voice [his] concerns and issues with." *Id.* at pp. 31–32. He asked Schanink whether management "find[s] it weird every single minority except [Johnson] is transferring from [the department] or quitting," as that is "for sure [a] sign something is drastically wrong and in need of [c]hange." *Id.* at p. 32. Schanink forwarded the messages to Nava, his supervisor, who sent them to HR Manager Michael Minniear. *See* Doc. 48-5. Minniear held a meeting with Johnson and Nava on May 10, in which Minniear went over Johnson's complaints and discussed ways to resolve his issues in collaboration with Johnson's managers. *Id.*

3

Then, on May 20, Johnson and a coworker, referred to in the briefing as A.B., got into a verbal altercation over their work, instigated by A.B. Johnson made a complaint to Shanink via Facebook messenger on May 21. (Doc. 48-3, pp. 33–34). Schanink reminded Johnson to send his complaints to Nava, provided Nava's phone number to Johnson, and forwarded these concerns to Minniear, who conducted an investigation and pursued disciplinary action against both Johnson and A.B. *Id.* at pp. 35–36; *see* Docs. 48-6, 48-7 & 48-8. There was no mention of race in Johnson's complaint or the investigation.

Less than a week later, Johnson reported to manager Jose Casas that he found a swastika drawn on a box. (Docs. 48-9 & 48-5). Casas went with Johnson and took a picture of the drawing. (Doc. 48-9). The issue was reported to Cory Bauer, operations manager, who pulled video footage but found no evidence of anyone drawing on the box in question. *Id.* The picture was then sent to HR for review. *Id.* Minniear conducted an investigation and learned that the symbol—which Johnson later characterized as a "black cross"—was on a box that had come from outside the facility. (Doc. 48-10). Minniear held a meeting to discuss the drawing with Johnson. *Id.* Minniear explained to Johnson that the box may have arrived from the vendor with the drawing and that review of the video footage did not show anyone at Walmart drawing on the box. *Id.* The conversation concluded with Minniear assuring Johnson that they would monitor and investigate all his concerns, saying they appreciated him being a part of the team, and Johnson thanking Minnear before returning to work. *Id.*

In mid-June, Johnson complained that his vehicle had been vandalized. Doc. 48-12; *see* Doc. 48-4, pp. 9–11; *see also* Doc. 48-11 (pictures of car damage). Johnson, however, conceded in his deposition that there was a "good possibility" that his car was

hit rather than vandalized, and there is no evidence in the record that would suggest the damage came from vandalism rather than a collision. (Doc. 48-4, pp. 10–12). Minniear conducted another investigation and held another meeting with Johnson and his managers. During this meeting, Walmart gave Johnson the option to move shifts, including to a weekend shift in which he had expressed interest See Doc. 48-12; Doc. 48-4, p. 13. Johnson agreed to take the weekend shift under a different manager, and he made the lateral move. (Doc. 48-2, pp. 2–3; Doc. 48-4, p. 13). While Johnson worked a few hours less, his hourly pay increased, and he agreed in his deposition that the pay "pretty much rounded out about the same" and was "almost exactly the same." (Doc. 48-4, p. 13).

In September 2022, Johnson complained in writing that a coworker had said Johnson's name was "Carl Lee like the blk [sic] guy" in "A Time to Kill." (Docs. 48-12 & 48-13). Minnear investigated and took both employees' statements. (Docs. 48-12 & 48-13).

On December 2, 2022, Johnson was terminated for attendance issues. (Doc. 48-14).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Subpart (a) to Rule 56 provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In considering a motion for

summary judgment, the Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that logically can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1998). If a party fails to respond to a motion for summary judgment, the reviewing court is still obligated to address the merits of the motion and may not rule automatically in the movant's favor. *Soliman v. Johanns*, 412 F.3d 920, 922 (8th Cir. 2005); *United States v. One Parcel of Real Prop.*, 27 F.3d 327, 329 n.1 (8th Cir. 1994); *Canada*, 135 F.3d at 1213 ("When a motion would be dispositive of the merits of the cause if granted, courts should normally not treat a failure to respond to the motion as conclusive.").

Discrimination "that creates a hostile work environment" violates Title VII, but such claims "are limited in nature, requiring a high evidentiary showing that the plaintiff's workplace is 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Vajdl v. Mesabi Acad. of KidsPeace, Inc.*, 484 F.3d 546, 550 (8th Cir. 2007) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To establish a prima facie claim of a hostile work environment in this case, Johnson must show that (1) he was a member of a protected racial group; (2) he was subjected to unwelcome harassment; (3) there was a connection between the harassment and his protected class; (4) the harassment affected a term, condition, or privilege of his employment; and (5) the employer failed to take prompt remedial action when it "knew or should have known of the harassment." *Id.* Johnson has established that he was a member of a protected racial group and was subject to unwelcome harassment

6

connected to his protected class. However, there is no genuine issue of material fact as to the fourth and fifth elements.

"In order for harassment to have affected a term, condition, or privilege of employment, the harassment must have been 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Clay v. Credit Bureau Enters., Inc.*, 754 F.3d 535, 540 (8th Cir. 2014) (quoting *Harris*, 510 U.S. at 21). "More than a few isolated incidents are required, and the alleged harassment must be so intimidating, offensive, or hostile that it poisoned the work environment." *LeGrand v. Area Res. for Cmty. & Hum. Servs.*, 394 F.3d 1098, 1101 (8th Cir. 2005) (internal quotations marks and citations omitted). When analyzing this prong of the prima facie case, courts should look to "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 1102 (quoting *Harris*, 510 U.S. at 21).

As Walmart notes, the vast majority of Johnson's claims involved generalized frustrations with his working environment, issues with various co-workers untethered to his race, and various assumptions that he was being treated differently due to his race. (Doc. 49, p. 10). In *Clay v. Credit Bureau Enterprises, Inc.*, the plaintiff alleged over thirty incidents of a racially hostile work environment (with twelve of these falling in the statute of limitations period). 754 F.3d at 538. Some of the incidents included race-based comments, but the plaintiff "relie[d] mostly on speculation and conjecture to show that the alleged harassment was race based." *Id.* at 538, 541 (citations omitted). The Eighth Circuit affirmed summary judgment because the incidents, taken together, were not

sufficiently severe or pervasive, and the plaintiff did not show "that the environment was physically threatening" or "that the alleged discriminatory conduct was humiliating or interfered with her work." *Id.*; *see also, e.g., Canady v. Wal-Mart Stores, Inc.*, 440 F.3d 1031, 1035 (8th Cir. 2006) (holding that a manager calling himself a "slave driver" and stating "what's up, my n\*\*\*\*" were insufficient to create a hostile work environment); *Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958, 967 (8th Cir. 1999) (finding that allegations that co-workers and supervisors would not speak to the plaintiff, treated her rudely, slammed doors in her face, keyed her car, and made threatening gestures to her were not severe enough to show she experienced sexual harassment sufficient to alter the conditions of her employment). Under Supreme Court precedent, the "mere utterance of an epithet that engenders offensive feelings in a[n] employee does not sufficiently affect the conditions of employment to give rise to a triable hostile work environment claim." *Harris*, 510 U.S. at 21 (cleaned up).

Additionally, the unrefuted evidence shows that Walmart timely investigated Johnson's complaints and implemented action steps towards resolution, including providing him the option of moving to a different shift with a different manager when the problems persisted. Thus, the Court finds that, even when viewing all evidence and making all inferences in Johnson's favor, there is no genuine issue of material fact on his claim of hostile work environment, so Walmart is entitled to judgment on this claim as a matter of law.

Under Title VII, it is unlawful for an employer to retaliate against an employee because that employee opposed the employer's discriminatory employment practice. 42 U.S.C. § 2000e–3(a). To prevail on a retaliation claim, a plaintiff must demonstrate that

(1) he engaged in protected activity; (2) subsequent materially adverse action was taken against him; and (3) the materially adverse action was causally linked to his protected activity. *Ellis v. Houston*, 742 F.3d 307, 322–23 (8th Cir. 2014) (citation omitted). "Retaliation must be the 'but for' cause of the adverse employment action." *Blomker v. Jewell*, 831 F.3d 1051,1059 (8th Cir. 2016) (cleaned up).

Johnson alleges two potential adverse actions as the basis of his retaliation claim:[1] (1) that he was assigned harsher duties in early March following complaints made in January; and (2) that his schedule was changed resulting in a loss of income. The record evidence submitted by Defendants dispels both bases.

There is no evidence that Johnson engaged in any protected activity prior to his March 9 complaint regarding his work assignment. Though he had certainly made complaints regarding inadequate training and rude coworkers, there was no mention of this being based on a protected status. Therefore, to the extent his retaliation claim rests on this fact, it fails as a matter of law. *See Hunt v. Nebraska Pub. Power Dist.*, 282 F.3d 1021, 1028 (8th Cir. 2002) (holding that plaintiff did not engage in a protected activity for purposes of Title VII where she did not attribute the employer's "failure to give her a raise or a promotion to sex discrimination").

---

[1] In its Memorandum Opinion and Order (Doc. 46), the Court noted that Johnson had not adequately pled retaliatory termination due to the time lapse between any alleged protected activity and his termination. *See, e.g.*, *Recio v. Creighton Univ.*, 521 F.3d 934, 941 (8th Cir. 2008) (holding a six-month gap too long to give rise to inference of causal connection); *Lewis v. St. Cloud State Univ.*, 467 F.3d 1133, 1138 (8th Cir. 2006) ("We have held that an interval as brief as two months did not show causation for purposes of establishing a retaliation claim and that a two-week interval was 'sufficient, but barely so.'").

Johnson's claim also fails as a matter of law as to the second possible adverse action. "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." *Rester v. Stephens Media, LLC*, 739 F.3d 1127, 1131 (8th Cir. 2014) (citation and quotation marks omitted). The uncontroverted record evidence shows that—far from being forced to transfer—Johnson was offered the opportunity to move shifts in an effort to resolve complaints he had against certain coworkers, and he accepted this offer. Moreover, the record shows that he was not disadvantaged as he received an additional $5.00 per hour and made the same total pay despite reduced hours. Consequently, Johnson's retaliation claim fails as a matter of law.

The Court is sympathetic to what appears to have been a trying work environment. However, the Court is required to follow the decisions of the Eighth Circuit and Supreme Court. Under that precedent, there are no genuine issues of material fact, and Defendant is entitled to judgment as a matter of law. Accordingly, Defendant's Motion for Summary Judgment (Doc. 48) is **GRANTED**, and the suit is **DISMISSED WITH PREJUDICE**. Judgment will enter contemporaneously with this Order.

**IT IS SO ORDERED** on this 24th day of January, 2025.

/s/ Timothy L. Brooks
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE